The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hedrick and upon the briefs and argument of counsel. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
* * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement, at the hearing and by post-hearing agreement as:
STIPULATIONS
1. On 12 July 1993, the date of plaintiff's alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer.
3. First of Georgia Insurance was the workers' compensation insurance carrier on the risk.
4. Plaintiff's average weekly wage was sufficient to generate the applicable maximum compensation rate of $442.00.
5. An indexed set of medical records received by the Industrial Commission on 16 November 1995 is admitted into evidence.
6. Plaintiff's Answers to Defendants' First Set of Interrogatories, marked as Stipulated Exhibit Number Two, are admitted into evidence.
7. A one page statement prepared by plaintiff, marked as Stipulated Exhibit Number Three, is admitted into evidence.
8. The sole issue to be tried is compensability.
* * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences drawn therefrom, the Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was fifty-four years old and had practiced law for 26 years. In 1980, the law firm of Lovekin Ingle was founded by the principal partners Stephen Lovekin and John Ingle. Between 1980 and 1987 the firm had a mixed practice including personal injury, domestic relations, and criminal defense. Beginning in approximately 1987 the firm began limiting its practice to personal injury, worker's compensation, medical malpractice and products liability.
2. As of December of 1992, the law firm had a key staff consisting of the two partners, one associate attorney, Leslie Yount, an office manager/paralegal named Katie Edwards and a legal assistant named Angie Beach.
3. Mr. Lovekin's practice consisted mostly of personal injury cases on behalf of the plaintiff. Mr. Ingle's practice was more geared towards worker's compensation although he and Mr. Ingle tried most of their personal injury cases together.
4. On July 12, 1993, Mr. Lovekin had an acute cardiac incident shortly after lunch. His staff noticed that he had turned pale to the point of being white, had chest pains, shortness of breath and nausea. At the insistence of staff, Mr. Lovekin was taken to the office of Dr. Lee Young, a family practitioner. Dr. Young had Mr. Lovekin taken by ambulance to the emergency room at Frye Regional Medical Center where emergency quadruple bypass surgery was performed by Dr. Michael Crouch.
5. According to the deposition testimony and opinions of Mr. Lovekin's surgeon, Dr. Michael Crouch, and Defendant's expert, Dr. N.B. Harbold, Jr., in July of 1993, Mr. Lovekin was at significant risk of having a heart attack. Dr. Harbold even described Mr. Lovekin as a "coronary time bomb." Both doctors acknowledged that Mr. Lovekin had several classic predisposing factors which increased his risk of having a heart attack. These acknowledged risks include 30 years of cigarette smoking, poorly controlled diabetes mellitus, labile hypertension, elevated triglycerides and a positive family history of heart disease.
6. Beginning in December of 1992, the law firm experienced a series of unusual work related events which were outside the normal practice of law. In late December, the partners and the staff began a period of emotional and inflammatory discontent which led to the departing of the entire key staff of the firm. Leslie Yount ended her employment with the firm on December 28th. Katie Edwards left in January of 1993, and Angie Beach left in March of 1993.
7. The work load shouldered by the three individuals who left was substantial. According to Defendants' evidence, they did almost all of the work of the firm.
8. This body of work had to be absorbed by Mr. Lovekin and Mr. Ingle. Mr. Lovekin testified that his work load more than doubled, forcing him to work as much as 16-18 hours a day. A new associate hired in January of 1993 was such a disappointment that he was more of a drain on the work load than a benefit.
9. The firm eventually hired another paralegal, B.J. Houck, who was able to begin to ease the work load. However, the stress associated with the large number of cases, the increased office hours and the fear of mistakes, problems and missing deadlines greatly increased the level of anxiety and stress suffered by Mr. Lovekin. In one instance, Mr. Lovekin had to endure the threat of being sued for malpractice, an obviously stressful situation. The increased time at work also limited the time he was able to participate in stress relieving pursuits such as family life and exercise.
10. During the same general period of time, there were several matters involving the finances of the firm which greatly increased the stress suffered by Mr. Lovekin. A long standing IRS audit concluded in December of 1992, resulting in an assessment against the firm in the sum of $120,000.00. During 1993, the firm income dropped because of the aforementioned personnel situation, the inability to take on new matters, clients going to other lawyers, including to the attorney which had left.
11. In 1993, a rumor had begun that the firm was in financial difficulty or was going to go bankrupt. Finally, a self audit of the firm's trust account conducted following the change in personnel disclosed that there was an apparent discrepancy of approximately $18,000.00. Although this discrepancy was eventually found to be a numerical error shortly before Mr. Lovekin's heart attack, this added greatly to the general level of stress suffered by Mr. Lovekin during the course of the investigation.
12. The uncontradicted medical evidence in this case from Dr. Harbold and Dr. Crouch indicate that the unusually high level of stress suffered by Mr. Lovekin in the months prior to his attack triggered, aggravated, or accelerated his acute cardiac incident necessitating emergency coronary by-pass surgery.
13. In his letter of December 19, 1995, Dr. Harbold states "stress is also a risk factor and certainly most cardiologists believe that stress might well aggravate a situation by causing the heart to work harder but in this condition, I would say stress was just an aggravating factor in a long buildup of this disease".
14. In his letter of October 28th to the T.M. Mayfield 
Company, adjusters, Dr. Crouch stated "there is little doubt in my mind that the amount of stress, strain and fatigue he had been undergoing in the previous six months to his heart attack accelerated his condition." This stress was work related.
15. Both expert physicians who have testified by deposition in this case, one for the defense and one for the Plaintiff, have agreed that Mr. Lovekin's unusual stressful situation, work related, in the months preceding his attack aggravated and accelerated his cardiac problems necessitating the need for emergency surgery on July 12, 1993. There is no evidence to the contrary.
16. The Full Commission finds that the unusual stressful work related situation leading up to Mr. Lovekin's cardiac problems necessitating the need for emergency surgery on July 12, 1993, constituted an injury by accident arising out of and in the course of his employment and was a direct and proximate cause of those cardiac problems. The stressful events in the months preceding the attack were directly related to the business of the law practice of Lovekin Ingle. This series of events were not events which were a part of the usual and customary practice of law experienced by Mr. Lovekin previously.
17. The medical testimony in this case was by deposition and the Full Commission is in as good a position to judge its weight and credibility as was the Deputy Commissioner.
********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
CONCLUSIONS OF LAW
1. Increased work related stresses preceding his heart attack constituted an interruption of his normal work routine for plaintiff. G.S. § 97-2(6). Gabriel v. Newton, 227 N.C. 314,42 S.E.2d 96 (1947); Dillingham v. Yeargin Construction Co.,320 N.C. 499, 358 S.E.2d 380, (1987); Ballenger v. ITT Grinnell IndustrialPiping, 320 N.C. 155, 357 S.E.2d 683 (1987).
2. On 12 July 1993, plaintiff sustained an injury by accident arising out of and in the course of his employment when he experienced an acute cardiac incident as the result of unusual levels of work related stress. G.S. § 97-2(6).
3. Plaintiff is entitled to have defendants pay for all medical expenses incurred as the result of his 12 July 1993 injury by accident, including the emergency by-pass surgical procedure. G.S. § 97-25.
4. As the result of his injury by accident and related surgical procedures, plaintiff is entitled to such other compensation as may be agreed to by the parties or determined by a Deputy Commissioner after hearing.
******
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay for medical treatment incurred by plaintiff as a result of his injury by accident, including the emergency by-pass surgical procedure.
2. Defendants shall pay to plaintiff other compensation to which plaintiff is entitled, if any, as may be agreed to by the parties or determined by a Deputy Commissioner after hearing.
3. If the parties are unable to agree upon what other compensation is due the plaintiff, either of them may initiate the hearing process by filing a Form 33 with the Commission.
4. Defendants shall pay the costs, including paying Dr. Crouch $200.00 as an expert witness fee.
 S/ ____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ____________ COY M. VANCE COMMISSIONER
DISSENTING:
S/ ____________ DIANNE C. SELLERS COMMISSIONER